**IN THE COURT OF APPEALS OF IOWA**

No. 23-1537
Filed January 10, 2024

**IN THE INTEREST OF R.R.-A.,**
**Minor Child,**

**T.A., Father,**
    Appellant.
_____

    Appeal from the Iowa District Court for Black Hawk County, Daniel Block,

Associate Juvenile Judge.


    A father appeals the termination of his parental rights to his child.

**AFFIRMED.**


    Thomas J. Richter of Beecher, Field, Walker, Morris Et. Al., Waterloo, for

appellant father.

    Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney

General, for appellee State.

    Joseph G. Martin, Cedar Falls, attorney and guardian ad litem for minor

child.


    Considered by Tabor, P.J., and Badding and Chicchelly, JJ.

**CHICCHELLY, Judge.**

A father appeals the termination of his parental rights to his child, R.R.-A. The father contends the State failed to prove statutory grounds for termination, termination does not serve the child's best interests, a permissive exception should be granted due to the parent-child bond, a six-month extension should have been granted, and a relative guardianship should have been granted. The mother voluntarily consented to the termination of her rights during the same proceeding and does not appeal. Upon our de novo review, we affirm the termination of the father's parental rights.

## I. Background Facts and Proceedings.

The Iowa Department of Health and Human Services first became involved with this family soon after R.R.-A.'s birth in 2018. The parents have a substantial history of substance abuse and domestic violence. The father was charged with domestic abuse assault impeding flow of air or blood and child endangerment after an incident of domestic violence against the mother in April 2019, and a no-contact order was issued. Another incident of domestic abuse assault occurred in front of R.R.-A. during the most recent time the Department assessed the family. During the same period, R.R.-A. was also reportedly playing in the street while the father was supposed to be supervising him. These incidences led to the Department's investigation being founded. The State petitioned to adjudicate R.R.-A. a child in need of assistance in July 2019, and the juvenile court granted the petition.

The next four years were a rollercoaster of noncompliance by the father. Throughout the proceedings, the Department was concerned that the father was more interested in rekindling his relationship with the mother than connecting with

his child. Department providers had reservations about the father's willingness to participate and comply with services. The father's providers described him as "manipulative" and argumentative, engaging in "outbursts" in front of R.R.-A. He lied frequently about attending and "completing" services, following the no contact order against the mother, and his housing situation. When R.R.-A. was placed with the paternal grandmother, the father blatantly violated the Department's directives by cohabitating with them both. He also had frequent unsanctioned, unsupervised contact with R.R.-A., even taking him from his placement and bringing him to the mother's home for overnight stays without the Department being contacted. When this situation was eventually discovered, the grandmother was considered an unsafe placement and R.R.-A. was placed with a foster family.

The Department was also very concerned with the long history of domestic violence and conflict between the parents. There were multiple incidents and allegations of domestic abuse throughout the proceedings, leading to multiple charges against the father. Just two weeks before the termination hearing, the parties engaged in what was described by the mother as "horrible violence" resulting in yet another no contact order.

The high level of conflict was not limited to the father's relationship with the mother. There was also growing animosity between the parents and the paternal grandmother. The Department's caseworker testified that R.R.-A. was "[p]ainfully" aware of the disharmony between his family members and this has had a negative impact on him. During visitations that included both the father and the grandmother, the two often used the time to "vent" or argue rather than spending it engaging with R.R.-A. When the grandmother served as relative placement, the

father and grandmother argued over who would be primary caregiver if the proceedings continued.

The father also has severe substance-abuse issues. He has a substantial history of methamphetamine use, dating back to when he was twelve or thirteen years old. He struggled to remain sober despite the multitude of mental-health and substance-use services offered. He frequently missed appointments, resulting in being discharged from his mental-health programming twice for non-attendance. He dallied with scheduling and completing a substance-abuse evaluation, and he lied to providers for weeks before being caught. When pressed for answers, he told the Department that he was unsure why he had not completed the evaluation, but "that he was just kind of tired of this whole proceeding and wanted it done." His drug tests showed a similar narrative of noncompliance, with him often refusing to show. When he did test, there were periods of sobriety followed by periods of relapse. As recently as January 2023, the father tested positive for methamphetamine using a hair-strand test. Three months later in March, police officers discovered methamphetamine in his vehicle and he was charged as a result.

The father was as inconsistent in attending visitation throughout the proceedings as he was with the rest of his services. There were periods where he would request visits and attend regularly while at other times, he would not. For example, the father had no visits with R.R.-A. between February 17, 2020, and July of that year. He declined the video conferencing offered because of the COVID-19 pandemic and expressed to the Department that "he felt it best for [R.R.-A.] if he did not have any contact with him right now." On another occasion,

the father requested visitations but demanded the Department was "going to have to bring [R.R.-A.] to him because he didn't have a [driver's license]." In general, the father's repeated incarcerations for domestic abuse assault also contributed to the inconsistent contact with his child.

Based on the inconsistency with services and engagement with R.R.-A., the juvenile court ordered the State to petition for termination in April 2023. The State petitioned to terminate parental rights on May 9. After an August termination hearing, the juvenile court terminated parental rights. The father appeals.

## II. *Review.*

Our review of termination proceedings is de novo. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). While not binding, "we give weight to the trial court's findings of fact, especially when considering credibility of witnesses." *Id.*

## III. *Discussion.*

Iowa courts use a three-step analysis to review termination of parental rights, including whether (1) grounds for termination have been established, (2) termination is in the child's best interests, and (3) we should exercise any of the permissive exceptions to termination. *In re A.S.*, 906 N.W.2d 467, 472–73 (Iowa 2018). We address each step, but our primary concern is the best interests of the child. *In re J.H.*, 952 N.W.2d 157, 166 (Iowa 2020).

*A. Grounds for Termination.*

The juvenile court terminated the father's parental rights under Iowa Code section 232.116(1)(e), (f) and (l) (2023). We may affirm if the evidence supports termination on any one ground. *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

We focus on section 232.116(1)(f), which allows the court to terminate parental rights if it finds:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The issue on appeal is whether the child could be returned to the father's custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4); *see also D.W.*, 791 N.W.2d at 707 (interpreting "at the present time" to mean "at the time of the termination hearing").

While the father claims he has addressed his substance-abuse, criminal, and domestic-abuse concerns that were originally at issue, we disagree. Clear and convincing evidence shows that R.R.-A. cannot be returned to the father's custody. Although the father has had periods of sobriety and engagement with services during the four years between removal and termination, he was largely inconsistent. There were frequent times during that span when he was using methamphetamine, committing acts of violence, and was otherwise noncompliant with services. In the past, the father has been dishonest with the Department in his self-reporting, and we are not convinced that any recent improvement is either genuine or lasting. *See C.B.*, 611 N.W.2d at 495 (considering a parent's "past performance" as reflective "of the quality of the future care that parent is capable of providing" (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981))). We

therefore affirm the finding that R.R.-A. could not be returned to his father at the time of the termination hearing.

B. *Best Interests.*

Next, the father contends that termination is not in R.R.-A.'s best interests. In determining best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The "defining elements" of the best-interests analysis are the child's safety and "need for a permanent home." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted).

We agree with the juvenile court that termination is in the best interests of R.R.-A. In four years, the father has not shown that he can provide and care for his child consistently. He has struggled to maintain sobriety, engage with services, and attend visitations. There have been times where the father rejected offered services outright and did not comply with the Department's requirements. "It is not in the best interest of the child to return to a parent who refuses to address the [Department's]'s primary concerns." *In re A.G.*, No. 18-1161, 2018 WL 6131920, at *3 (Iowa Ct. App. Nov. 21, 2018) (cleaned up). We therefore find termination of the father's parental rights to be in the child's best interests.

C. *Permissive Exception to Termination.*

The father also argues an exception to termination should be granted because of the bond between him and R.R.-A.[1]  *See* Iowa Code § 232.116(3)(c)

---

[1] The father makes this argument as part of the best-interests analysis, but we address it here instead.

(providing a discretionary exception to termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). The court is given wide discretion "based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (citation omitted). This burden is placed on the parent, who must establish "that, on balance, that bond makes termination more detrimental than not." *In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021). We do not discount the love the father has for his child. But we find no showing that R.R.-A. would be particularly disadvantaged by the termination and decline not to terminate based on a parent-child bond.

*D. Extension of Time.*

The father argues that a six-month extension would have provided him sufficient time to resume custody. *See* Iowa Code § 232.104(2)(b) (permitting the juvenile court to grant an extension to work toward reunification if "the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period"). He cites his recent improvements and sobriety as reasons for the extension.

While we commend any progress the father has made, it comes too late. *See C.B.*, 611 N.W.2d at 495 ("A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting."). Throughout most of the proceedings, he has relapsed multiple times and been noncompliant with services. His history of inconsistency and instability does not convince us an additional six months would make a

difference. R.R.-A. has already waited a substantial portion of his short life for his parents to be able to care for him, and we cannot delay permanency for him with the hope that the father will change. *A.M.*, 843 N.W.2d at 112 (finding "that we cannot deprive a child of permanency . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child" (quoting *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010))).

*E. Guardianship.*

Finally, the father asks us to place R.R.-A. in a guardianship with his mother to eliminate the need for termination. *See* Iowa Code § 232.116(3)(a) (stating that the court need not terminate parental rights if "[a] relative has legal custody of the child"). But Iowa courts do not prefer guardianship over termination and adoption. *A.S.*, 906 N.W.2d at 477. "The child's best interests always remain the first consideration." *Id.* at 475 (citation omitted).

We find a guardianship would not serve R.R.-A.'s best interests and, in all likelihood, would prove harmful. The grandmother has already been deemed unsuitable by the Department based on her dishonesty as well as her inability to maintain care of the child. When R.R.-A. was placed with her, she allowed the parents to engage in unsafe and unsupervised visits with him. Further, the level of conflict between the grandmother and the father has been shown to have detrimental impacts on the child. Finally, R.R.-A. has been without permanency for over four years, and a guardianship will not provide it. *Id.* at 478 (declining to establish a guardianship because it would be "woefully inadequate to achieve the sort of stable, nurturing and permanent home" the child needs). We therefore decline to order a guardianship.

*IV.*     *Disposition.*

Because we find the statutory grounds are satisfied, termination and the denial of a guardianship are in the best interests of the child, and no permissive exceptions or extensions apply, we affirm termination of the father's parental rights.

**AFFIRMED.**